# In the United States Court of Federal Claims

No. 16-1423C

(Filed: October 25, 2017)

```
************************************
                                   *
PATRICIA HADDOCK, et al.,          *
                                   *
                      Plaintiffs,  *    Veterans Exposed to "Agent Orange"
                                   *    During Vietnam War; Putative Class
                                   *    Action of Veterans and Survivors to
v.                                 *    Recover Retroactive Retirement Pay;
                                   *    Motion to Dismiss; Motion to Stay
THE UNITED STATES,                 *    Proceedings.
                                   *
                      Defendant.   *
                                   *
************************************
```

*Howard Stanislawski,* with whom were *Howard J. Rubinroit, Ronald C. Cohen, Bradley J. Dugan,* and *Logan P. Brown,* Sidley Austin LLP, Washington, D.C. and Los Angeles, California, and *Barton F. Stichman,* National Veteran's Legal Services Program, Washington, D.C., for Plaintiffs.

*Renée A. Burbank,* with whom were *Chad A. Readler,* Acting Assistant Attorney General, *Robert E. Kirschman, Jr.,* Director, *Douglas K. Mickle,* Assistant Director, Commercial Litigation Branch, Civil Division, Department of Justice, Washington, D.C., and *Benjamin B. Hamlow* and *William J. Hess, III,* Defense Finance and Accounting Service, for Defendant.

### ORDER ON DEFENDANT'S MOTION TO DISMISS
### AND PLAINTIFFS' MOTION TO STAY

WHEELER, Judge.

This case arises from the U.S. military's use of "Agent Orange," a toxic chemical mixture deployed as a jungle defoliant during the Vietnam War. Many veterans contracted serious ailments from being exposed to Agent Orange in Vietnam more than 45 years ago, and have yet to resolve with the Government their claims for disability and retroactive retirement pay. A history of Agent Orange litigation, and the post-war treatment of our Vietnam veterans, could go on for many pages, but is not necessary for purposes of the

pending motions. See Nehmer v. U.S. Dep't of Veterans Affairs, 494 F.3d 846, 849 (9th Cir. 2007) ("It is a disturbing story, and the performance of the United States Department of Veterans Affairs (VA) has contributed substantially to our sense of national shame.").

Pending before the Court are Defendant's motion to dismiss for lack of standing and mootness, and Plaintiffs' motion to stay proceedings.  For the reasons explained below, both of these motions are DENIED.

Background[1]

On October 28, 2016, putative class members Patricia Haddock, Ira Sue Roberts, Patricia Springer, and Lupe Zamora, filed a class action complaint in this Court on behalf of themselves and others similarly situated seeking retroactive military retired pay from being exposed to Agent Orange while serving in Vietnam.  Mrs. Haddock is the surviving spouse of Nehmer class member and military retiree Thomas M. Haddock, who suffered from Parkinson's disease and died on June 14, 2010.  Mrs. Roberts is the surviving spouse of Nehmer class member and military retiree Gary Roberts, who suffered from coronary artery disease and died on February 27, 2011.  Mrs. Springer is the surviving spouse of Nehmer class member and military retiree Larry E. Springer, who suffered from coronary artery disease and died on November 12, 2007.  Lupe Zamora is the surviving spouse of Nehmer class member and military retiree Emilio B. Zamora, who suffered from Parkinson's disease and died on October 12, 2009.  See Compl. ¶¶ 9-12.  Also on October 28, 2016, counsel for Plaintiffs filed a companion case in the U.S. District Court for the Northern District of California seeking review under the Administrative Procedure Act and injunctive relief.

Military retirees who incurred disabilities as a result of their military service may be entitled to receive both military retired pay, paid by the Defense Finance and Accounting Service ("DFAS"), and VA disability compensation, paid by the VA. Id. ¶ 20.  The amount of VA disability compensation to which a veteran is entitled is based on the veteran's combined disability rating, which is a determination made by the VA concerning the severity of the veteran's service-connected disability, or disabilities.  Disability ratings are made in increments of 10 percent, between 0 and 100 percent.  The amount of military retired pay a veteran/military retiree is entitled to receive is calculated by DFAS based on a formula which considers the military retiree's former salary and years of service.  Id. ¶ 21.

Prior to 2004, federal statutes and regulations did not permit veterans who were entitled to both military retired pay and VA disability compensation to receive full payments of both benefits at the same time.  See 38 U.S.C. §§ 5304, 5305; 38 C.F.R. §

---

[1]  The facts in this Background section are taken mainly from Plaintiffs' Class Action Complaint for Monetary Relief, filed October 28, 2016.

3.750.  Instead, veterans who were otherwise entitled to both benefits had to waive some or all of their military retired pay in order to receive all of the tax-free VA disability compensation to which they were entitled.  Compl. ¶ 22.  Since VA disability compensation is tax-free, veterans often elected VA disability compensation over military retired pay.  In effect, they waived a dollar of their military retired pay for each dollar of VA disability compensation they received.  Thus, the election that most veterans made resulted in the amount of military retired pay they received being reduced by the amount of VA disability compensation.  Id. ¶ 23.

10 U.S.C. § 1414 became effective in 2004, and allowed for concurrent receipt of both military retired pay and VA disability compensation for certain eligible military retirees.  The Department of Defense is responsible for administering the program, which it delegates to DFAS.  In effect, section 1414 restored to eligible veterans the right to receive some or all of the military retired pay that they previously had waived in order to receive their VA disability compensation.  This restoration of military retired pay is known as Concurrent Retirement and Disability Pay ("CRDP").  Id. ¶ 24.  With the enactment of section 1414, veterans with at least a 50 percent combined VA disability rating and at least 20 years of qualifying military service were scheduled for the first time to receive, at some future date, both their full military retired pay and their VA disability compensation.  See 10 U.S.C. § 1414.

Upon the enactment of section 1414, veterans did not immediately become entitled to receive 100 percent of their military retired pay.  Instead, section 1414 has "phase-in" periods during which a portion of the veteran's military retired pay is to be "restored" each calendar year until the applicable phase-in period has been completed.  Section 1414 explains in detail how to determine the amount of military retired pay under CRDP that is available to veterans pursuant to this phase-in schedule.  Compl. ¶ 25.  Section 1414 has two phase-in periods:  one for veterans with a disability rating of 50-90 percent, and another for veterans with a rating of 100 percent.  For veterans with a 50-90 percent disability rating, section 1414 provides for a ten-year phase-in period, such that the percentage amount of military retired pay restored to the veteran was to increase each calendar year until 2014, when the phase-in period would be completed.  From January 1, 2014 onward, the veteran would be entitled to receive his or her full military retired pay.  Id. ¶ 26.  For veterans with a disability rating of 100 percent, section 1414 provides for a one-year phase-in period, such that veterans would be entitled to receive his or her full military retired pay beginning on January 1, 2005.  Id. ¶ 27.

While the VA and DFAS are separate agencies, each is responsible for providing its own benefits to eligible veterans.  Both agencies represent that they work together to ensure that eligible retired veterans receive the CRDP to which they are entitled under section 1414.  Id. ¶¶ 30-32.

During the Vietnam War, many veterans were exposed to Agent Orange, a chemical defoliant containing the toxic substance dioxin. Id. ¶ 34. The United States used Agent Orange to clear dense jungle land and, through such use, exposed members of the military to "one of the most highly toxic substances known to the scientific community." Nehmer v. U.S. Veterans' Admin., 712 F.Supp. 1404, 1407 (N.D. Cal. 1989) ("Nehmer I"). Human exposure to Agent Orange led to a multitude of diseases, including leukemia, Hodgkin's Disease, Ischemic Heart Disease, Diabetes, Multiple Myeloma, Non-Hodgkin's Lymphoma, Parkinson's Disease, Peripheral Neuropathy, Porphyria Cutanea Tarda, Prostrate Cancer, Respiratory Cancers, and Soft Tissue Sarcomas. Compl. ¶ 34 (citing VA list of Diseases Associated with Agent Orange).

After the Vietnam War ended, the VA "routinely denied compensation for veterans who allege[d] that exposure to Agent Orange . . . caused diseases other than chloracne." Nehmer I, at 1407. "As of October 1, 1983, 9,170 veterans filed claims with disabilities that they allege[d] were caused by Agent Orange; 7,709 were denied compensation because the VA found that the claimed diseases were not service connected." Id.

In response to the controversy over Agent Orange, Congress in 1984 enacted the Veterans' Dioxin and Radiation Exposure Compensation Standards Act ("the Dioxin Act"), Pub. L. No. 98-542 (HR 1961), 99 Stat. 2725, 98th Cong.2d Sess., reprinted in part at, 38 U.S.C. § 1154. The Dioxin Act was intended to ensure that all veterans who were disabled by reason of their service in Vietnam received appropriate disability compensation. Nehmer I, at 1407. The Dioxin Act authorized "the Administrator of the VA to conduct rulemaking to determine which diseases will be deemed service connected for *all diseases* claimed to be caused by Agent Orange exposure," rather than determining whether each veteran's claimed disease was caused by Agent Orange exposure on an individual basis. Id. Despite the Dioxin Act and Congress's stated goal of providing appropriate benefits to all veterans who were disabled as a result of exposure to Agent Orange, the VA failed to provide veterans with the benefits they were due, thus necessitating extensive litigation brought on behalf of the Nehmer class. Compl. ¶ 36.

On April 22, 1985, the VA's Administrator, in a proposed rule, "set forth five factors to govern evaluation of the scientific evidence." Nehmer I, at 1408. The proposed rule reiterated that chloracne was the only disease that was service-connected. Id. After extensive review of background information and scientific studies on the effects of Agent Orange exposure on human populations, the VA published a final regulation identical to the proposed rule, stating that "sound scientific and medical evidence does not establish a cause and effect relationship between dioxin exposure and any other disease except chloracne." Id. By December 1987, "over 31,000 veterans [had] been denied compensation under this regulation." Id.

On February 2, 1987, Vietnam veterans and survivors of veterans filed a class action lawsuit in the Northern District of California alleging that the final regulation was invalid

because it violated, among other things, provisions of the Dioxin Act and the judicial review provisions of the Administrative Procedure Act.  Id.  The District Court certified the plaintiffs' proposed class of current or former service members, or their next of kin, who were eligible to apply for claims before the VA for service-connected disabilities arising from exposure to Agent Orange, or who had a claim denied by the VA for exposure to Agent Orange.  The District Court agreed with plaintiffs that without certification, "they could win the battle to change the Dioxin regulation, and lose the war to provide benefits to wrongly denied applicants."  Nehmer v. U.S. Veterans' Admin., 118 F.R.D. 113, 120 (N.D. Cal. 1987).

On the merits of the case, plaintiffs alleged that the VA and the Administrator failed to comply with the Dioxin Act by failing to review pertinent scientific studies, wrongfully precluding consideration of animal studies, wrongfully requiring the scientific studies to demonstrate a "cause and effect" relationship between exposure to Agent Orange and the claimed diseases rather than the less demanding standard that there is a "statistical association" between the two, "failing to give the benefit of the doubt to the veterans when confronted with conflicting evidence of approximately equal weight," and "fail[ing] to produce and transmit accurate committee minutes to the Administrator, so that the Administrator's review of the Committee's conclusions was distorted."  Nehmer I, at 1409.

Congress enacted the Agent Orange Act of 1991, 38 U.S.C. § 1116, after the District Court in Nehmer invalidated the VA regulations under the Dioxin Act.  The Agent Orange Act required the VA Secretary to conduct new rulemaking proceedings to determine which diseases are sufficiently associated with exposure to Agent Orange so that veterans with diseases determined to be associated receive a presumption of service-connection, thus entitling them to VA disability compensation.  Compl. ¶ 40; see 38 U.S.C. § 1116.

On May 14, 1991, following the enactment of the Agent Orange Act of 1991, the VA and the Nehmer class entered into a Final Stipulation and Order.  This Order provides, among other things, that as soon as the VA promulgates a regulation designating a particular dioxin-related disease as "service-connected," the VA must (1) identify all veterans and survivors who had previously filed a claim based on the newly recognized disease; (2) readjudicate the claims of these veterans and survivors under the newly promulgated regulation; and (3) in those cases in which the VA awards disability compensation for the newly recognized disease as a result of the readjudication, pay those veterans VA disability compensation retroactive to the date of the previous claim.  Compl. ¶ 41.  The end product of this process is typically described as a "Nehmer readjudication decision."  The VA also is required to provide notice to each class member that his or her claim would be readjudicated.  Id.

Federal regulations provide that "[i]f a Nehmer class member entitled to retroactive benefits . . . dies prior to receiving payment of any such benefits, VA shall pay such unpaid retroactive benefits to the first individual or entity listed below that is in existence at the

time of payment: (i) The class member's spouse . . . (ii) The class member's child(ren) . . . (iii) The class member's parent(s) . . . (iv) The class member's estate." 38 C.F.R. § 3.816(f)(i)—(iv).

Since 1991, the VA has issued new determinations designating particular dioxin-related diseases as service-connected, including in 1994, 1996, 2001, 2003, 2007, and most recently in 2010. The most recent additions in 2007 and 2010 – after CRDP was enacted – resulted in veterans/retirees becoming entitled, as a result of a Nehmer readjudication decision, to both retroactive payments of VA disability compensation (because of a retroactive increase in their combined VA disability rating) and military retired pay (because section 1414 requires receipt of both benefits). Compl. ¶ 43.

On October 13, 2009, the VA's Secretary announced his decision under the Agent Orange Act of 1991 to establish new diseases as being presumptively service-related due to Agent Orange exposure. These new diseases included hairy-cell leukemia and other B-cell leukemias, Parkinson's disease, and ischemic heart disease. On August 31, 2010, the VA published a final regulation in the Federal Register, 38 C.F.R. § 3.309(e), expanding the list of disabilities presumed to be related to Agent Orange and other herbicide exposures to include in the foregoing diseases. Compl. ¶ 44.

After the promulgation of 38 C.F.R. § 3.309(e) and pursuant to the 1991 Final Stipulation and Order in Nehmer, the VA identified more than 100,000 Nehmer class members who were entitled to a Nehmer readjudication because they had previously filed a VA claim based on one or more of the newly recognized diseases. On or about October 31, 2010, the VA began to readjudicate those previously filed disability claims concerning the three new diseases listed in section 3.309(e). Compl. ¶ 45.

Typically, the readjudication resulted in one of two outcomes. Either (1) the readjudication resulted in a retroactive increase in the veteran's combined VA disability rating, or (2) the readjudication had no effect on the veteran's combined VA disability rating. Compl. ¶ 46. If the veteran received a retroactive increase in the combined VA disability rating, then the veteran potentially could receive not only retroactive payments of VA disability compensation from the VA (regardless of the magnitude of the increase in the combined disability rating), but also retroactive payments of military retired pay from DFAS (so long as the new combined VA disability rating was at least 50 percent and the veteran had served at least 20 qualifying years). Id.

After a readjudication, the VA would notify, or attempt to notify, by mail the Nehmer veterans, or their surviving spouses, children, or parents, of their Nehmer readjudication decision, as required under the 1991 Stipulation and Order and 38 C.F.R. § 3.816(f). In many cases the VA failed to locate the veteran or his survivors. The National Veterans Legal Services Program ("NVLSP"), co-counsel here and in Nehmer, later

undertook and succeeded in finding many of those veterans or survivors, resulting in the payment of more than $3 million in VA disability compensation.  Compl. ¶ 47.

In thousands of cases in which the VA mailed a <u>Nehmer</u> readjudication decision to a military retired class member or the survivor of such a retiree, the VA announced in its notice letter to the class member that although the accompanying readjudication decision resulted in a retroactive increase in the combined VA disability rating, the VA was withholding payment of the retroactive VA disability compensation that was owed. Compl. ¶ 48.  In many of these notice letters, the VA stated that it was required by law to withhold all of the retroactive VA disability compensation that would otherwise be owed to the class member as a result of the accompanying readjudication decision because the class member had received military retired pay.   This statement was contrary to law because of the provisions of section 1414.  <u>Id</u>.  In many other cases, the VA did the exact opposite by paying the class member the amount owed as a result of the <u>Nehmer</u> readjudication decision pursuant to section 1414.  Compl. ¶ 49.

Pursuant to the privacy protection order entered during the <u>Nehmer</u> litigation, the VA has been periodically disclosing to NVLSP copies of the more than 100,000 notice letters and <u>Nehmer</u> readjudication decisions that VA has been sending to class members beginning in late 2010.  Starting in 2013, class members who are military retirees or their survivors began complaining to NVLSP that (a) VA had announced in the notice letters that it withheld the retroactive VA disability compensation owed as a result of the accompanying <u>Nehmer</u> readjudication decision, and (b) in the years that had elapsed since the announced withholding, the VA had still not released the wrongfully withheld compensation.   Compl. ¶ 50.   Accordingly, NVLSP in 2013 began to file written complaints with VA's counsel in <u>Nehmer</u> about individual military retirees or their survivors whose retroactive VA disability compensation had been wrongfully withheld, and VA's failure to take remedial action.  The Government's response to these complaints differed depending on whether the class member involved was a living military retiree or a survivor of a deceased military retiree.  <u>Id</u>.

With regard to living military retirees, government counsel informed NVLSP in 2014 that continued use of the complaint process to remedy VA withholding of retroactive VA disability compensation was not justified because the Government represented that it had, in 2014, "a process in place to ensure that the necessary withholding pay adjustments take place" for living military retirees whose VA disability compensation had been withheld years earlier.  Compl. ¶ 51.  NVLSP responded by asking, given that VA apparently had such a process in place, for VA to disclose to NVLSP the identity of the living military retirees whose cases VA intended to process in the future for a "necessary withholding pay adjustment."  The Government responded to this request by retracting its representation, admitting that no such process was in place to ensure that VA would release to living military retirees retroactive VA disability compensation the VA previously had withheld.  <u>Id</u>.

The Government stated that it would develop a list of all living military retirees who are potentially entitled to release of the VA disability compensation that VA had previously withheld and agreed to a timetable for review of those cases. Compl. ¶ 52. In 2015, VA provided NVLSP a list of 3,491 class members and a timetable for reviewing all of these cases. In exercising due diligence, NVLSP tested VA's representation that the list of 3,491 cases truly included all living military retirees to whom VA still owed disability compensation it had withheld years earlier. Id. NVLSP selected the cases of 197 living retirees who were not on the list of 3,491 cases, but who had their disability compensation withheld by the VA. Part way through investigating the cases of these 197 living retirees, NVLSP identified four who had their VA disability compensation withheld, and who informed NVLSP that they had never received the withheld compensation from the VA. In response to NVLSP's complaint about these four living retirees, the VA admitted that these four were owed the aggregate amount of $174,898 (more than $43,000 in tax-free compensation per retiree) that VA had withheld years earlier. Thereafter, VA admitted that its list of 3,491 cases was not "sufficient." Id. In 2016, the VA developed and provided NVLSP with a new list of 7,305 living retirees. The VA represented that the new list of 7,305 included all living retirees to whom VA still owed disability compensation it had previously withheld. It is unknown whether the VA's new list is accurate. Id.

In contrast to its response regarding living military retirees, VA did not state that it had a process in place to ensure that survivors of deceased military retirees would receive the disability compensation that VA had wrongfully withheld. Nor did VA assert that it had the ability to identify these survivors. Compl. ¶ 53. VA did agree that if NVLSP reviewed on its own the more than 100,000 notice letters and readjudication decisions that VA had disclosed pursuant to the privacy protection order and isolated class members who (a) are survivors of deceased military retirees, (b) had been the subject of VA withholding, and (c) had their combined VA disability rating retroactively increased in a Nehmer readjudication decision from less than 50 percent to 50 percent or more for all or part of the period from January 1, 2004 to the present, VA would review the case to determine whether it was required by law to release all or part of the retroactive disability compensation it withheld years earlier. Id.

As a result of this agreement, the VA has released more than $38.1 million to more than 1,500 class members identified by NVLSP as having been the subject of wrongful VA withholding of retroactive disability compensation (an average of more than $25,000 per class member in tax-free compensation). Compl. ¶ 54. These figures do not include hundreds of other survivors of deceased military retiree class members whom NVLSP has identified for VA to review and pay. Id.

Plaintiffs also allege that DFAS has taken an inconsistent and unlawful approach with respect to retroactive payments of military retired pay. According to Plaintiffs, in many cases, Nehmer class veterans who served for at least 20 years (or their survivors, if

deceased) and had a combined disability rating of at least 50 percent for any period of time on or after January 1, 2004, never received any payment of retroactive military retired pay, or heard from DFAS the amount they would be entitled to receive.  Compl. ¶¶ 55-57.

## The Current Motions

On March 3, 2017, Defendant filed a motion to dismiss Plaintiffs' complaint, arguing that DFAS previously had paid the four named plaintiffs for the retroactive military retired pay they seek.  Defendant asserted that these individuals lack standing, or that their claims are moot.  According to Defendant, the appropriate action is for the Court to dismiss the complaint rather than to substitute a different named plaintiff to represent the class.

On March 24, 2017, rather than responding to Defendant's motion to dismiss, Plaintiffs filed an amended complaint, naming a different set of individuals who would represent the class.  Ms. Haddock, Ms. Springer, and Ms. Zamora were still listed, but three new plaintiffs were named:  Roy Proctor, Janiece Peugh, and Stephen Meinz.  Roy Proctor is the surviving child of Nehmer class member and military retiree Joe Proctor, who suffered from coronary artery disease with congestive heart failure, and died on September 17, 2008.   Janiece Peugh is the surviving spouse of Nehmer class member and military retiree Harold Peugh, who suffered from ischemic heart disease and died on November 16, 2009.  Stephen Meinz is the surviving child of Nehmer class member and military retiree Peter Meinz, who suffered from ischemic heart disease and died on December 2, 2007.  See Am. Compl. ¶¶ 12-14.

On May 10, 2017, Defendant filed a motion to dismiss Plaintiffs' amended complaint.  Then, on June 28, 2017, Plaintiffs filed a motion to stay proceedings in this Court to allow the case pending in the Northern District of California to proceed first. Davis et al. v. United States, No. 3:16-cv-6258-TEH (N.D. Cal.).  Both of these motions have been fully briefed and argued.

At the September 26, 2017 oral argument, the Court inquired about the number of prospective class members who would be eligible to participate in this action.  Plaintiffs' counsel represented that the answer to this question still is being investigated, but that he estimated the number "was probably within the range of 30,000 – 35,000."  Transcript of Oral Argument ("Tr.") at 56.

## Discussion

I.    The Plaintiffs Have Standing to Bring Their Claims in This Court.

In the motion to dismiss the amended complaint, Defendant again asserted that all six of the named plaintiffs lack standing to pursue their claims because DFAS already has paid them the full amount due, or they have not submitted a claim to DFAS.

A. <u>Standard of Review</u>

"The Court of Federal Claims, though an Article I court, . . . applies the same standing requirements enforced by other federal courts created under Article III." <u>Anderson v. United States</u>, 344 F.3d 1343, 1350 n.1 (Fed. Cir. 2003). Whether a plaintiff has met these requirements is "a threshold jurisdictional issue," <u>Myers Investigative & Sec. Servs., Inc. v. United States</u>, 275 F.3d 1366, 1369 (Fed. Cir. 2002), such that a "lack of standing precludes a ruling on the merits." <u>Media Techs. Licensing LLC v. Upper Deck, Co.</u>, 334 F.3d 1366, 1370 (Fed. Cir. 2003). In considering a motion to dismiss for lack of subject matter jurisdiction under RCFC 12(b)(1), the Court must presume that all factual allegations in the complaint are true, and construe all reasonable inferences in favor of the plaintiff. <u>Scheuer v. Rhodes</u>, 416 U.S. 232, 236 (1974), *overruled on other grounds by* <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 814-15 (1982); <u>Reynolds v. Army & Air Force Exch. Serv.</u>, 846 F.2d 746, 748 (Fed. Cir. 1988). The party invoking federal jurisdiction bears the burden of establishing that it may bring its case before the Court. <u>Lujan v. Defs. of Wildlife</u>, 504 U.S. 555, 561 (1992). To establish standing, a plaintiff must show: (1) that it has suffered an "injury in fact," an invasion of a legally protected interest that is "(a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical," (2) that there is a "causal connection between the injury and the conduct complained of," and (3) that the injury is likely to be redressed by a favorable decision. <u>Id</u>. at 560-66.

"[A] case will not be rendered moot by subsequent acts if some of the requested relief remains available." <u>McTech Corp. v. United States</u>, 105 Fed. Cl. 726, 731 (2012) (quoting <u>BLR Grp. of Am., Inc. v. United States</u>, 94 Fed. Cl. 354, 361 (2010)). But, "where a defendant's actions have eliminated the possibility of meaningful relief, the case ordinarily should be dismissed as moot." <u>Id</u>. (citing <u>Deakins v. Monaghan</u>, 484 U.S. 193, 200-01 & n.4 (1988)). "A claim is not moot, however, if the action originally complained of is capable of repetition, yet evading review." <u>Torrington Co. v. United States</u>, 44 F.3d 1572, 1577 (Fed. Cir. 1995) (citations omitted). For this exception to the mootness doctrine to apply, (1) the "action must 'in its duration [be] too short to be fully litigated prior to its cessation or expiration;" and (2) "there must be a 'reasonable likelihood' that the party will again suffer the [injury] that gave rise to the suit." <u>Id</u>. (quoting <u>Cambridge Lee Indus, Inc. v. United States</u>, 916 F.2d 1578, 1581 (Fed. Cir. 1990)) (citations omitted).

B. <u>The Plaintiffs Have Claims that Have Not Been Mooted.</u>

While DFAS has paid in full the claims of Plaintiffs Haddock, Peugh, Zamora, and Proctor, remaining Plaintiffs Springer and Meinz have claims that have not been mooted by payment. In addition to filing this suit, Mr. Meinz has completed the available claim filing procedures pursuant to 31 U.S.C. § 3702, and thus it is clear his claim is ripe for payment. Opp'n of Pls. Springer & Meinz to Def.'s Mot. to Dismiss First Am. Class Action Compl. ("Pls.' Opp'n") 1-2. Plaintiffs also point out that Ms. Springer's claims are not moot, and thus she has standing, because despite having been paid, she contends that the amount received was less than the amount she is owed. <u>Id</u>. at 2. Plaintiffs further argue

that paying the claims of members of the class will not moot the claims because plaintiffs "must be afforded the opportunity to move for class certification." Id.

Even though the Government has paid the claims of some of the Plaintiffs, the Court finds that this fact does not render the entire case moot. Plaintiffs Springer and Meinz have standing in this case because they present unpaid claims. Further, Plaintiffs have made clear their intention to move for class certification, which underscores the "case or controversy" to be resolved. Therefore this case cannot be dismissed.

In response to the Government's argument that Plaintiffs' claims have been rendered moot by DFAS's payments to some of the named parties, Plaintiffs assert the "inherently transitory" exception (more commonly known as the "capable of repetition, yet evading review" exception), as articulated by Judge Henderson in the parallel Northern District of California case. Id. at 7, 17-25; see also Davis v. United States, 2017 WL 1862506 at *3 (N.D. Cal. May 9, 2017) (denying the Government's motion to dismiss by applying an exception to the mootness doctrine). It is worth noting that since Plaintiffs filed their complaint on October 28, 2016, many of their claims have peculiarly and promptly been paid. Plaintiff Springer coincidentally was paid by a check dated the very day the initial complaint was filed in this Court, see Tr. 24-25.[2] See Pls.' Opp'n 2. Given Defendant's apparent litigation strategy of paying the named parties to render their claims moot, also observed by Judge Henderson in the Northern District of California, see Davis, 2017 WL 1862506 at *1 (outlining timeline of case proceedings and payments sent to plaintiffs), the Court finds that the first element of the "capable of repetition, yet evading review" exception described in Torrington, 44 F.3d at 1577, has been met. With so many veterans who have potential claims, the Court will not permit Defendant to avoid judicial review by picking off a few named parties and paying them. The Court also finds the second element of the exception to be met, because the Plaintiffs have offered evidence to show that there are many other veterans (or their beneficiaries) whose retroactive benefits have yet to be paid. Am. Compl. ¶ 104; Tr. 56-59.[3]

Therefore, Defendant's motion to dismiss is DENIED.

## II.   A Motion to Stay is Inappropriate.

Plaintiffs have moved to stay the present proceedings pending the resolution of the analogous case before the Northern District of California. See Pls.' Mot. to Stay ("Mot. Stay"). Plaintiffs' principal arguments in favor of staying this case are based on the

---

[2]  Ms. Springer, however, did not *receive* the check until November 21, 2016, and it did not include any explanation of the purpose of the payment. Pls.' Opp'n 5.

[3]  The number of veterans (or their beneficiaries) who potentially have similar claims is uncertain, but as discovery proceeds, the parties will be better able to determine the number. Tr. 57:6—16. Both parties agree that there are veterans out there potentially with the same claim. Tr. 57:12—14; 58:4—59:11.

jurisdictional differences between the Northern District of California and this Court: they urge that because the parallel case is based on the Administrative Procedure Act, available injunctive relief is broader, and its resolution "will necessarily affect the monetary relief ordered here." Id. at 2, 7. The Government, in response, would have the Court deny the stay largely because the Court does not have jurisdiction over the instant case in the first place, as argued in its motion to dismiss. Def.'s Resp. to Mot. to Stay, 4 ("Def.'s Resp."). Having just denied that motion, the Court will proceed to rule on Plaintiff's motion to stay.

A. Standard of Review

The Court, in exercising its inherent authority to control its docket, has broad discretion to determine whether or not a stay is appropriate. St. Bernard Par. Gov't v. United States, 99 Fed. Cl. 765, 771 (2011) (citation omitted). The proponent of a stay bears the burden of establishing that the stay is necessary. Id. When the requested stay is indefinite, the movant must show a "pressing need" for the stay, and must further show that the "balance [of] interests favoring a stay" outweighs the other party's opposing interests. Cherokee of Okla. v. United States, 124 F.3d 1413, 1416 (Fed Cir. 1997). "Overarching this balancing is the court's paramount obligation to exercise jurisdiction timely in cases properly before it." Id.

B. Given the Interest of Judicial Efficiency, the Case Must Proceed.

Plaintiffs contend that a stay would be appropriate because its duration would not be indefinite. Mot. Stay, 8. As counsel for the parties indicated during oral argument, however, because Davis has been transferred to another judge, it is uncertain how long those proceedings may take. Tr. 8-9. Staying this case pending Davis's indefinite schedule would go against everything the Plaintiffs are requesting—a timely resolution. Therefore, there is no pressing need to stay this case pending the District Court's decision.

Plaintiffs' argument that the District Court's decision in Davis will impact this Court's decision is equally unpersuasive, as that Court's determination will not have a preclusive effect over this case. While the underlying background facts may be similar in this case and in Davis, the claims are based on different law, the plaintiffs are different, and they seek different relief. Adding these considerations to the need for timely resolution of Plaintiffs' claims, the interest of timeliness outweighs any potential for inconsistent resolution.

Due to significant concerns of judicial efficiency, the Court concludes that this case must move forward without staying the proceedings. To rule otherwise, in the absence of a pressing need, would be an "abuse of discretion." Cherokee of Okla., 124 F.3d at 1416 (citations omitted). Therefore, the Plaintiffs' motion to stay is DENIED.

<u>Conclusion</u>

For the foregoing reasons, Defendant's motion to dismiss and Plaintiffs' motion to stay are hereby DENIED.  Pursuant to RCFC 12(a)(4)(A)(i), Defendant shall file its answer to the amended complaint within 14 days, on or before November 8, 2017.

IT IS SO ORDERED.

<u>s/Thomas C. Wheeler</u>
THOMAS C. WHEELER
Judge